1

2

3

4

5

6

7

8           **UNITED STATES DISTRICT COURT**

9           **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  STEPHANIE VEGA and MICHAEL McNATT, <br> individually and on behalf of all others similarly <br> 12  situated, | )  Case No.: 1:14-cv-01790 - JLT <br> ) <br> )  AMENDED ORDER GRANTING FINAL <br> )  APPROVAL OF CLASS SETTLEMENT (Doc. <br> 13                      Plaintiffs, | 
|  | )  80) <br> ) |
| 14           v. | )  AMENDED ORDER GRANTING IN PART THE <br> )  MOTION FOR ATTORNEY'S FEES AND <br> 15  WEATHERFORD U.S., LIMITED | )  COSTS, AND CLASS REPRESENTATIVE <br> PARTNERSHIP, et al., | )  INCENTIVE PAYMENTS (Doc. 81) |
| 16 |  ) |
| 17 | )  _____ ) |

18           Stephanie Vega and Michael McNatt seek final approval of a class settlement reached with

19  Weatherford U.S., Limited Parnership and Weatherford Artificial Lift Systems, LLC. (Doc. 80) In

20  addition, Plaintiff seeks an award of attorney's fees and costs from the Settlement fund and a class

21  representative incentive payment. (Doc. 81) Defendant does not oppose these requests.

22  Because Plaintiffs meet their burden of demonstrating certification of the Settlement Class is appropriate

23  under Rule 23 of the Federal Rules of Civil Procedure and that the terms of the settlement are fair,

24  reasonable, and adequate, Plaintiffs' request for final approval of the Settlement is **GRANTED**. In

25  addition, Plaintiffs' request for attorney fees is **GRANTED**; costs are awarded in the amount of

26  $45,011.88; and Plaintiffs' request for incentive payments is **GRANTED** in the modified amount of

27  $5,000.

28  ///

1

## FACTUAL AND PROCEDURAL HISTORY

Stephanie Vega and Michael McNatt were employees at Defendants' Bakersfield, California location.  (Doc. 44 at 5, ¶11)  Ms. Vega was a full-time non-exempt employee between September 2011 and September 2013.  (*Id*.)  She was then promoted to a full-time exempt position, which she retained until May 2014.  (*Id*.)  Mr. McNatt was employed as a full-time hourly employee between September 2012 and July 2013.  (*Id*.)

Plaintiffs assert that non-exempt hourly employees "regularly worked shifts in excess of 8 hours per day and/or 40 hours per week.  (Doc. 44 at 5, ¶ 13)  Plaintiffs contend Defendants "underpaid all of their required overtime wages."  (*Id*. at 6, ¶ 14)  In addition, Plaintiffs allege Defendants maintained unlawful break policies, and "failed to authorize and permit…hourly non-exempt employees with all rest breaks to which they were entitled."  (*Id*., ¶ 15)  Similarly, Plaintiffs assert Defendants "failed to provide legally compliant meal periods...by failing to schedule timely meal periods and failing to ensure adequate coverage so as to not impede and/or discourage Plaintiffs and hourly non-exempt employees from taking legally compliant meal periods."  (*Id*. at 7, ¶ 16)  Further, Plaintiffs assert Defendants failed to pay all final wages within 72 hours of the end of their employment due to the wage, rest break, and meal break violations.  (*Id*., ¶ 17)

Based upon these factual allegations, Plaintiffs asserted that Defendants are liable for failure to pay overtime wages in violation of Cal. Labor Code §§ 204, 510, 558, 1194 and 198; violations of the Fair Labor Standards Act, 29 U.S.C. § 201; violations of the meal and rest break provisions of Cal. Labor Code § 226.7, 512, 516 and 558; wage statement penalties under Cal. Labor Code § 226; waiting time penalties under Cal. Labor Code §§ 201-203; unfair competition under Cal. Bus. & Prof. Code § 17200; and civil penalties under the Private Attorneys General Act, Cal. Labor Code § 2698.  (*See generally* Doc. 44)

On April 30, 2015, the parties stipulated to conditional class certification for the FLSA claims only (Docs. 37, 38), and provided notice to the putative class members.  (Doc. 67-1 at 16)  According to the parties, following a 75-day notice period, 865 individuals opted into the action. (*Id.* at 8)

In November 2015, the parties agreed to attend mediation, and the Court stayed all deadlines pending mediation. (Docs. 55, 56)  The parties attended a full-day of mediation with Mark Rudy on

March 24, 2016, after which "Mr. Rudy made a mediator's proposal for a class-wide resolution of all claims." (Doc. 56 at 15) The parties accepted the proposal, and filed a Notice of Settlement with the Court on April 12, 2016. (Doc. 61)

On July 22, 2016, the Court granted preliminary approval of the proposed settlement agreement ("the Settlement"). (Doc. 71) The Court granted conditional certification of two classes defined as:

> A. **California Settlement Class**: all non-exempt employees who worked for Weatherford in California between August 28, 2010 through July 4, 2016.
>
> B. **FLSA Settlement Class**: all individuals who opted into the lawsuit during the notice period.

(*Id.* at 17) In addition, Stephanie Vega and Michael McNatt were appointed as the class representatives and authorized to seek incentive payments up to $10,000 for their representation of the classes. (*Id.*) Hernaldo Baltodano of Baltodano & Baltodano LLP, and Paul Haines, Tuvia Korobkin and Fletcher Schmidt of Haines Law Group were appointed as Class Counsel, and authorized to seek fees that do not exceed 25% of the gross settlement amount, as well as costs up to $55,000.00 (*Id.*) Further, the Court appointed Rust Consulting, Inc. as the Claims Administrator. (*Id.*) On August 2, 2016, the Court approved the Class Notice Packets that conveyed this information to Class Members. (Doc. 77)

On August 22, 2016, the Claims Administrator mailed the Class notices to 1,758 individuals. (Doc. 82 at 4, Pikus Supp. Decl. ¶ 9) Of the mailed Class Notices, 98 were returned as undeliverable, but the Claims Administrator was able to re-send 69 of them with more current addresses. (*Id.* at 5, ¶ 11) Of these notices, nine were returned as undeliverable a second time, and the Claims Administrator determined a total of 35 notice packets were undeliverable. (*Id.*) Three members of the FLSA Settlement Class and ten members of the California Class completed the Exclusion Form. (*Id.*, ¶ 13) No objections to the settlement terms were received by the Settlement Administrator or filed with the Court. (*Id.*, ¶ 14)

Plaintiff filed the motion now pending before the Court for final approval of the Settlement on November 4, 2016. (Doc. 81)

## SETTLEMENT TERMS

Pursuant to the proposed settlement ("the Settlement"), the parties agree to a gross settlement amount not to exceed $6,000,000. (Doc. 67-1 at 18, Settlement § 3)

3

**I.      Payment Terms**

The settlement fund will cover payments to members of two classes: (1) the California Settlement Class comprised of "all non-exempt employees who worked for Weatherford in California" between August 28, 2010 and July 4, 2016 and (2) the FLSA Settlement Class including "all individuals who opted into the lawsuit during the notice period." (Doc. 67-1 at 16-17, Settlement § 1) In addition, the Settlement provides for payments to Class Representatives, Class Counsel, the Claims Administrator, and the California Labor & Workforce Development Agency. (*Id.* at 18; Settlement § 3.A) Specifically, the Settlement provides for the following payments from the gross settlement fund:

- Class Representatives will receive up to $10,000;

- Class Counsel will receive up to $1,500,000— which equals 25% of the gross settlement fund—and up to $55,000 for expenses;

- The Claims Administrator will receive up to $35,000 for fees and expenses; and

- The California Labor & Workforce Development Agency will receive $50,000 for PAGA civil penalties.

(Doc. 67-1 at 18, Settlement § 3) In addition, $156,000.00 of the gross settlement fund has been "designated as the 'FLSA Net Settlement Fund,'" to be paid to members of the FLSA Settlement Class only. (*Id.* at 19, Settlement § 4) After these payments have been made, the remaining funds – estimated to total $4,184,000.00 – will be distributed to California Settlement Class Members. (*Id.*)

**II.     Releases**

The Settlement provides that Plaintiffs and Class Members, other than those who elected not to participate in the Settlement, at the time final judgment is entered, release Defendants from the claims arising in the class period. Specifically, the Settlement provides:

> California Settlement Class members will release all claims pled in this Lawsuit or could have been pled in this Lawsuit and based on the factual allegations set forth in the Second Amended Complaint, including, but not limited to, any and all claims under California law for: (i) failure to pay overtime wages; (ii) failure to provide meal periods; (iii) failure to authorize and permit rest periods; (iv) wage statement penalties; (v) waiting time penalties; (vi) unfair competition; and (vii) civil penalties under the Private Attorneys General Act ("PAGA") (hereinafter collectively referred to as the "California Released Claims"). For members of the Settlement Class who do not opt out, the release period shall run from August 28, 2010 through the date of entry of a Preliminary Approval Order or July 4, 2016, whichever occurs first.

4

FLSA Settlement Class members will release all claims that are asserted or could have been asserted under the FLSA, based on Weatherford's alleged failure to pay all overtime wages based on a miscalculation of the regular rate of pay. For members of the FLSA Settlement Class, the release period shall run from actual date the individual opted in to the Lawsuit through the date of Preliminary Approval or July 4, 2016, whichever occurs first.

(Doc. 67-1 at 17, Settlement § 2)

The release for Plaintiffs encompasses more claims than the release of Class Members, including "all claims that are asserted or that could have been asserted in the Lawsuit, whether known or unknown, under federal law or state law against Weatherford arising out of their employment with Weatherford or the termination thereof.." (*See* Doc. 67-1 at 17, Settlement § 2.C)

### III.     Objections and Opt-Out Procedure

The Class Notices informed the Class Members of the nature of the action, the class definition, the claims and issues to be resolved, and the binding effect of a class judgment.  (Doc. 67-1 at 32-33; *see also* Doc. 77)  The Class Notices also explained how any class member who wished had an opportunity to object or to elect not to participate in the Settlement.  (*Id.*)

### IV.     Service of the Notice Packets and Responses Received

On July 22, 2016, the Court ordered the Claims Administrator, Rust Consulting, to mail the Class Notice Packets to Class Members.  (Doc. 71 at 18)  According to Chris Pikus, Senior Project Manager for Rust Consulting, the Class Notice Packets were mailed via the United States Postal Service to the 1,759 Class Members identified by Defendants.  (Doc. 82, Pikus Decl. ¶¶ 1, 9)  This included 883 individuals who received the California Class Notice Packet, 777 individuals who received the FLSA Class Notice Packet, and 98 individuals who received the Class Notice Packet for both classes.  (*Id.*, ¶ 9)

The United States Postal Service returned 98 Class Notice Packets as "undeliverable."  (Doc. 82 at 5, Pikus Supp. Decl. ¶ 11)  The Claims Administrator located more recent addresses for 69 individuals and re-mailed the Notice Packets.  (*Id.*)  Mr. Pikus reports that nine of the Notice Packets "were returned as undeliverable a second time," and a total of 35 Notice Packets remained undeliverable.  (*Id.*)  According to Mr. Pikus, no member of either the California Class or FLSA Class objected to the proposed Gross Settlement Amount or "disputed the accuracy of the proposed formula

for determining Individual Settlement Shares." (*Id.*, ¶¶ 14, 15)  Mr. Pikus reports that the average settlement share for the California Class Members is $4,178.66 and the average settlement payment for FLSA Class Members is $158.14.  (*Id.* at 5-6, ¶19)

## APPROVAL OF A CLASS SETTLEMENT

### I.      Legal Standard

When parties reach a settlement agreement prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

### II.      Certification of a Class for Settlement[1]

Class certification is governed by the Federal Rules of Civil Procedure, which provide that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all."  Fed. R. Civ. P. 23(a).  Under the terms of the Settlement, the proposed classes are defined as:

> **California Settlement Class**: all non-exempt employees who worked for Weatherford in California between August 28, 2010 through the date of Preliminary Approval or July 4, 2016, whichever occurs first.

> **FLSA Settlement Class**:  all individuals [who] opted into the lawsuit during the notice period.

(Doc. 67-7 at 16, Settlement § 1)  Plaintiffs bear the burden of demonstrating the elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b).

---

[1] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

1    *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  Here, Plaintiffs contend the

2    circumstances have not changed since the classes were conditionally certified. (Doc. 80 at 25)

3    **A.    Rule 23(a) Requirements**

4         The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

5    by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

6    155-56 (1982) (citing *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980)). Rule 23(a) requires:

7         (1) the class is so numerous that joinder of all members is impracticable; (2) there are
          questions of law or fact common to the class; (3) the claims or defenses of the
8         representative parties are typical of the claims or defenses of the class; and (4) the
          representative parties will fairly and adequately protect the interests of the class.

9

10   *Id.*  These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy

11   of representation.  *Falcon*, 457 U.S. at 156.

12              1.    Numerosity

13        A class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P.

14   23(a)(1).  This requires the Court to consider "specific facts of each case and imposes no absolute

15   limitations."  *EEOC*, 446 U.S. at 330.  Although there is no specific numerical threshold, joining more

16   than one hundred plaintiffs is impracticable.  *See Jordan v. county of Los Angeles*, 669 F.2d 1311, 1319

17   & n.10 (9th Cir. 1982) (finding the numerosity requirement was "satisfied solely on the basis of the

18   number of ascertained class members" and listing thirteen cases in which courts certified classes with

19   fewer than 100 members), *vacated on other grounds*, 469 U.S. 810 (1982).  Here, there were 1,759

20   Class Members identified by Defendants.  (Doc. 82, Pikus Supp. Decl. ¶¶ 1, 9)  This included 883

21   individuals in the California Settlement Class only, 777 individuals in the FLSA Settlement Class only,

22   and 98 individuals who were members of both classes.  (*See id.*, ¶ 9)  Therefore, the numerosity

23   requirement is satisfied by both classes.

24              2.    Commonality

25        Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

26   Commonality "does not mean merely that [class members] have all suffered a violation of the same

27   pro-vision of law," but "claims must depend upon a common contention."  *Wal-Mart Stores*, 131 S. Ct.

28   at 2551.  Previously, Plaintiff asserted,

> [T]here are common questions of fact and law arising from Plaintiffs and the proposed
> California Settlement Class' employment with Weatherford, such as Weatherford's
> alleged miscalculation of the regular rate of pay for overtime purposes, written meal and
> rest period policies and practices, and derivative waiting time, wage statement and PAGA
> penalties – all of which Plaintiffs contend arise from a common core of salient facts.

(Doc. 67 at 29)  Because the class members were subjected to uniform policies, and there are common questions concerning whether Defendants' policies violated California wage and hour laws capable of class-wide resolution, the Court finds the commonality requirement is satisfied.

### 3.    Typicality

This factor requires a finding that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to be identical, but rather "reasonably co-extensive" with those of the absent class members. *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (typicality is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Here, Plaintiffs were both employed by Defendants as non-exempt employees, and subjected to the same meal and rest break policies as the class members.  In addition, Plaintiffs were subjected to the same overtime pay policies as the class members.  Accordingly, the Court finds the typicality requirement is satisfied for the FLSA Settlement Class and the California Settlement Class.

### 4.    Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to have a binding effect. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, representative parties must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

a.      *Class counsel*

Hernaldo Baltodano, Paul Haines, Tuvia Korobkin, and Fletcher Schmidt seek appointment as Class Counsel.  As the Court noted previously, Class Counsel report that they "diligently litigated this case, undertook an extensive analysis of the claims and potential damages."  (Doc. 67 at 31)  Further, Plaintiffs reports there are no conflicts between Class Counsel and members of the settlement classes. (*Id.*)  Defendants do not oppose the appointment or assert Class Counsel are inadequate to represent the interest of the class.  Therefore, the Court finds the Hernaldo Baltodano, Paul Haines, Tuvia Korobkin, and Fletcher Schmidt satisfy the adequacy requirements.

b.      *Class representatives*

Plaintiffs seek appointment as the class representative of the Settlement Class, and there are no known conflicts with the interests of other Class Members.  Rather, the primary interest of the named Plaintiffs is aligned with those of the class—to maximize recovery.  Thus, it appears Plaintiffs will fairly and adequately represent the interests of the class.

**B.      Certification of a Class under Rule 23(b)**

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266. Plaintiffs assert certification is appropriate under Rule 23(b)(3), which requires finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  According to Plaintiffs,

> Here, the primary issues with respect to the California Settlement Class are the miscalculation of the regular rate of pay, meal and rest period violations, and derivative penalties. Common issues predominate as to the regular rate miscalculation theory because all non-exempt employees were eligible to receive "wellness" bonuses, and the value of the "wellness" bonuses was never included in the regular rate of pay for purposes of calculating overtime pay, resulting in a systematic underpayment of overtime wages. These types of claims are routinely certified under Rule 23(b)(3). *See, e.g., Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (holding that district court abused its discretion in failing to certify a class action where class claim was predicated on a miscalculation of the regular rate of pay due to payment of non-discretionary bonuses); As to Plaintiffs' meal and rest period claims, because all members of the California Settlement Class were subject to the same uniform written policies, the claims of these individuals should also be found to predominate, especially at the settlement stage. *See e.g., Benton v. Telecom Network Specialists Inc.*, 220 Cal.App.4th 701, 726 (2013) ("We agree with *Bradley* and *Faulkinbury's* conclusion that, under *Brinker*, the fact that individual inquiry might be necessary to determine whether individual employees were

9

able to take breaks despite the defendant's allegedly unlawful policy (or unlawful lack of a policy) is not a proper basis for denying certification").

For these same reasons, common issues will also predominate with respect to Plaintiffs' derivative claims for wage statement, waiting time and PAGA penalties. *See, e.g. Bradley v. Networkers Internat.*, LLC (2012) 211 Cal.App.4th 1129, 1134, 1156, (the court held that the trial court erred in declining to certify the plaintiffs' overtime, meal- and rest-break claims, and that insofar as the plaintiffs' waiting-time penalty claims "were based on plaintiffs' overtime and/or meal and rest break claims, the court should have granted class certification on these claims.").

(Doc. 67 at 32-333).

The predominance requirement is satisfied because Defendants' liability on the claims can be determined based on common evidence. Similarly, the superiority requirement is satisfied because there is no evidence that the individuals encompassed in the FLSA Settlement Class and California Settlement Class have any interest in individually pursuing the claims.

Because the factors set forth in Rule 23(b) weigh in favor of certification, Plaintiffs' request to certify the FLSA Settlement Class and California Settlement Class is **GRANTED.**

## III.    Evaluation of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval is required to ensure the settlement is consistent with Plaintiffs' fiduciary obligations to the class. *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985). The Ninth Circuit identified several of factors to evaluate whether a settlement meets these standards, including:

the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted). Further, a court should consider whether settlement is "the product of collusion among the negotiating parties." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458 (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).

In reviewing settlement terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute." *Class Plaintiffs*, 955 F.2d at 1291(internal quotations and citation omitted).

10

### A.      Strength of Plaintiffs' Case

When evaluating the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp 1379, 1388 (D. Az. 1989))

In this action, "Plaintiffs steadfastly maintain that their claims are meritorious," but also "acknowledge that there were substantial risks and uncertainty in proceeding with class certification and trial." (Doc. 80 at 17)  For example, Plaintiffs report that Defendants argued its employees in California were "properly authorized and permitted to take all required rest periods, and Defendants' managers were trained to authorize rest periods in compliance with California law." (*Id.*)  In addition, "Defendants argued that Plaintiffs lacked any common evidence on which to prove class-wide damages for rest period violations," which "would necessarily defeat class certification of this claim." (*Id.* at 18) Further, Plaintiffs contend they "faced significant obstacles" in certifying their meal period claim based on automatic deductions, "given that the inquiry of whether a meal period was actually taken in instances where the automatic deduction applied would necessarily involve individualized inquiries on a member-by-member and shift-by-shift basis." (*Id.*)

Given the challenges identified by Plaintiffs—as well as the fact that the parties conducted thorough investigations and discovery allowing them to assess the strengths and weaknesses of the case—this factor weighs in favor of final approval of the Settlement.

### B.      Risk, Expense, Complexity, and Likely Duration of Further Litigation

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the Settlement were to be rejected, the parties would have to engage in further litigation, including re-certification of a class and discovery on the issue of damages.  (Doc. 80 at 18-29)  Specifically, Plaintiffs contend that "in the event that the proposed Rule 23 Classes were certified, Plaintiffs would need to conduct formal merits-based discovery." (*Id.* at 19)  Further, the parties would incur additional fees and costs through disputing class certification and trial.  (*Id.*)  On the other hand, the Settlement provides for the immediate recovery for the class, with the settlement share for the California Class

1   Members estimated to be 4,178.66 and the average settlement share for FLSA Class Members is

2   $158.14. (Doc. 82 at 5-6, Pikus Supp. Decl. ¶19)  Thus, this factor weighs in favor of preliminary

3   approval of the Settlement.

4              **C.       Maintenance of Class Status throughout the Trial**

5              The parties stipulated to the certification of the FLSA Class, but Plaintiffs acknowledge the

6   collective action "faced the prospect of decertification by Defendants following additional discovery."

7   (Doc. 80 at 19)  According to Plaintiffs, "Absent settlement, there was a risk that there would no

8   certified class at the time of trial."  (*Id.*)  Due to the risk to the claims of Class Members, this factor

9   supports preliminary approval of the Settlement.

10             **D.       Amount offered in Settlement**

11             The Ninth Circuit observed that "the very essence of a settlement is compromise, 'a yielding of

12  absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688

13  F.2d 615, 624 (9th Cir. 1982) (citation omitted).  Thus, when analyzing the amount offered in

14  settlement, the Court should examine "the complete package taken as a whole," and the amount is "not

15  to be judged against a hypothetical or speculative measure of what *might* have been achieved by the

16  negotiators."  *Id.* at 625, 628.

17             Plaintiffs report they "predicted that Defendants' total realistic recovery was approximately

18  $5,601,049 for the California Settlement Class, and $156,000 for the FLSA Settlement Class, for a

19  combined total of roughly $5,757,049."  (Doc. 80 at 20; Doc. 67-1, Haines Decl. ¶ 21)  Therefore,

20  "[t]he proposed settlement of $6,000,000 … represents approximately 104% of Plaintiffs' reasonably

21  forecasted recovery."  (*Id.*)  Accordingly, the Court finds the amount offered in settlement supports

22  final approval of the agreement terms.

23             **E.       Extent of Discovery Completed and Stage of the Proceedings**

24             The Court is "more likely to approve a settlement if most of the discovery is completed because

25  it suggests that the parties arrived at a compromise based on a full understanding of the legal and

26  factual issues surrounding the case." *Adoma*, 913 F. Supp. 2d at 977 (quoting *DIRECTV, Inc.,* 221

27  F.R.D. at 528).

28             Plaintiffs assert that "[t]he parties engaged in a significant amount of formal and informal class-

12

wide discovery, legal research, investigation and analysis prior to reaching the proposed Settlement." (Doc. 80 at 23)  Specifically, Plaintiffs report that Defendants responded to "two sets of Special Interrogatories and one set of Requests for Inspection and Production of Documents."  (*Id.*) Defendants "produced the payroll and timekeeping data for all FLSA Settlement Class members, and approximately 73% of the timekeeping data and 85% of the payroll data for the California Settlement Class."  (*Id.*)  Plaintiffs then hired an expert to analyze the payroll and timekeeping data produced by Defendants."  (*Id.*)

Given the discovery completed by the parties, it appears that the parties made informed decisions, which lead to resolution of the matter with a mediator.  (*See* Doc. 80 at 24)  As a result, the agreement "is presumed fair," and this factor supports final approval of the Settlement. *See Adoma*, 913 F. Supp.2d at 977.

###    F.    Experience and Views of Counsel

In general, "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528. Here, Plaintiffs the appointed Class Counsel are experienced in class action litigation, and "possess more than three decades of plaintiff- and defense-side wage and hour class action experience litigating claims alleging overtime, minimum wage, meal and rest period, and related wage statement and final payment violations."  (*See* Doc. 80 at 24)

Hernaldo Baltodano previously asserted, "have personally evaluated the strengths and weaknesses of Plaintiffs' claims, both as to class certification and the merits, and I believe that the proposed Settlement is an excellent result for the Settlement Classes."  (Doc. 67-4 at 10, Baltodano Decl. ¶12)  Similarly, Paul Haines reported he has significant experience with class litigation, and believed "the proposed Settlement is an excellent result for the Settlement Classes."  (Doc. 67-1 at 8, Haines Decl. ¶ 8; *see also id.*, ¶¶ 2-7)  Accordingly, the views of Class Counsel support final approval of the Settlement.

###    G.    Reaction of Class Members to Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class

1   members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529.  Significantly, no objections to the terms of the

2   Settlement were filed by Class Members following service of the Class Notice Packets.  In addition,

3   Plaintiffs agreed to the terms of the Settlement, and did not have any objections to the terms.  (*See* Doc.

4   67-1 at 26-27)  Therefore, this factor weighs in favor of approving the Settlement.

5       **H.   Collusion between Negotiating Parties**

6       The inquiry of collusion addresses the possibility that the settlement agreement is the result of

7   either "overt misconduct by the negotiators" or improper incentives of class members at the expense of

8   others.  *Staton*, 327 F.3d at 960.  Previously, Plaintiffs note that the parties here "reached this

9   settlement only after mediating with Mark Rudy, one of the preeminent wage and hour class action

10  mediators in California."  (Doc. 67 at 26)  After the parties accepted Mr. Rudy's proposal, they

11  "negotiated and drafted the long-form Settlement Agreement over the following six weeks."  (Doc. 80

12  at 14)  Notably, the Ninth Circuit has determined the "presence of a neutral mediator [is] a factor

13  weighing in favor of a finding of non-collusiveness." *In re Bluetooth Headset Products Liab. Litig.*,

14  654 F.3d 935, 946 (9th Cir. 2011).  Given the duration of the negotiations and the presence of a neutral

15  mediator, it appears the agreement is the product of non-collusive conduct.  Accordingly, this factor

16  weighs in favor of approval of the Settlement.

17  **IV.   Conclusion**

18      The factors set forth by the Ninth Circuit weigh in favor of final approval of the Settlement,

19  which appears to be is fair, reasonable, and adequate as required by Rule 23.  Therefore, Plaintiffs'

20  motion final approval of the Settlement Agreement (Doc. 80) is **GRANTED**.

21           **REQUEST FOR ATTORNEYS' FEES AND COSTS**

22      Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be

23  awarded pursuant to Rule 23(h).  The Settlement authorizes Class Counsel to seek attorneys' fees up to

24  25% of the gross settlement fund, for a total of $1,500,000.  (Doc. 67-1 at 18, Settlement § 3.B)

25      Under the "common fund" doctrine, attorneys who create a common fund for a class may be

26  awarded their fees and costs from the fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444

27  U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than

28  himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award

from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing Co.*, 444 U.S. at 478. Here, the Settlement applies distribution formulas to determine the amount paid to Class Members, and application of the common fund doctrine is appropriate.

## I.    Legal Standards

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement" to determine whether it is "'fundamentally fair, adequate, and reasonable' Fed.R.Civ.P. 23(e)." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003)). To do so, the Court must "carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Id.*

A court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case. *See Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting a court may not adopt representations regarding the reasonableness of time expended without independently reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request where "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

The party seeking fees bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000). Therefore, a fee applicant must provide time records documenting the tasks completed and the amount of time spent. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007). "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433.

Significantly, when fees are to be paid from a common fund, as here, the relationship between

the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class. It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted). As a result the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

The Ninth Circuit determined both a lodestar and percentage of the common fund calculation "have [a] place in determining what would be reasonable compensation for creating a common fund." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). Whether the Court applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund cases be reasonable under the circumstances." *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also Staton*, 327 F.3d at 964 (fees must be "fundamentally fair, adequate, and reasonable").

## A.     Lodestar Method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433). The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). Next, the court may adjust the lodestar upward or downward using a "multiplier" considering the following factors adopted by the Ninth Circuit in a determination of the reasonable fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

1   *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  However, the Court has since

2   suggested that the fixed or continent nature of a fee and the "desirability" of a case are no longer

3   relevant factors.  *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5

4   (9th Cir. 2011) (citing *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992)).

5   **B.    Percentage from the common fund**

6   As the name suggests, under this method, "the court makes a fee award on the basis of some

7   percentage of the common fund."  *Florida*, 915 F.2d at 545 n. 3.  In the Ninth Circuit, the typical range

8   of acceptable attorneys' fees is 20% to 30% of the total settlement value, with 25% considered the

9   benchmark.  *See, Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir. 2002); *Hanlon*, 150 F.3d

10  at 1029 (observing "[t]his circuit has established 25 % of the common fund as a benchmark award for

11  attorney fees").  The percentage may be adjusted below or above the benchmark, but the Court's

12  reasons for adjustment must be clear.  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th

13  Cir. 1989).

14  When assessing whether the percentage requested is reasonable, courts may consider a number

15  of factors, including "the extent to which class counsel achieved exceptional results for the class,

16  whether the case was risky for class counsel, whether counsel's performance generated benefits beyond

17  the cash settlement fund, the market rate for the particular field of law (in some circumstances), the

18  burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work),

19  and whether the case was handled on a contingency basis."  *In re Online DVD-Rental Antitrust

20  Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (internal quotation marks omitted)

21  **II.    Evaluation of the fees requested**

22  "The district court has discretion to use the lodestar method or the percentage of the fund method

23  in common fund cases." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re

24  Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir.

25  1997)).  Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at 70;

26  *In re Online DVD-Rental Antitrust Litigation,* 779 F.3d at  954-55.  Further, the Court may "appl[y] the

27  lodestar method as a crosscheck" to determine whether the percentage requested is reasonable.

28  *Vizcaino*, 290 F.3d at 1050, n.5.

17

## A.     Time and labor required

Class Counsel provided declarations attorneys who worked on this action, which include exhibits indicating time work and tasks undertaken.  (*See* Doc. 81-1, Baltodano Decl.; Doc. 81-2, Haines Decl.; Doc. 81-3, Schmidt Decl.; and Doc. 81-4, Korobkin Decl.)  Specifically, Mr. Baltodano reports his law firm has expended 626.50 hours on this action.  (Doc. 81-1 at 11, Baltodano Decl. ¶ 19; *see also* Doc. 81-1 at 18-32)  In addition, Mr. Haines asserts that his firm expended 424.55 hours on the matter.  (Doc. 81-2 at 9, Haines Decl. ¶ 13; *see also* Doc. 81-2 at 14-33)  The tasks undertaken by Class Counsel during the course of this litigation include:

> conducting an extensive factual investigation of the claims at issue, including interviewing witnesses; performing legal research and analysis; propounding and responding to written discovery; preparing for and attending the parties' Rule 26(f) conference meeting of counsel; preparing for depositions; interviewing and meeting with the named plaintiffs; meeting and conferring with Defendants regarding Defendants' deficient discovery responses; performing on-going legal research and analysis regarding the certification of claims; substantial substantive law and motion practice including conditionally certifying a nationwide FLSA overtime collective action under the FLSA and moving to compel discovery responses; meeting and conferring with Defendants regarding the scope of data needed for a class-wide mediation; analyzing Defendants' wage and hour policies; analyzing Defendants' payroll and timekeeping records and Class member data; discussing case strategy with Plaintiffs on numerous occasions, both in-person and via telephone; drafting the mediation brief; negotiating for the production of extensive class data, allowing Plaintiffs and their retained expert to review and analyze timekeeping and payroll data for all FLSA Settlement Class members and approximately 73% of the timekeeping data and 85% of the payroll data for the California Settlement Class members; working with an expert to create and refine class-wide damage models; preparing for and attending a day-long mediation session; negotiating and drafting the proposed class action Settlement Agreement and associated forms over the course of six weeks; preparing the motions for preliminary approval of class action settlement, final approval of class action settlement, attorneys' fees and costs, and incentive payment, and related memoranda; monitoring the settlement administration process including, but not limited to, answering questions from scores of settlement class members; and preparing for and attending the final approval hearing.

(Doc. 81 at 27-28; *see also* Doc. 81-1, Baltodano Decl., Exh. A; Doc. 81-2, Haines Decl., Exh. A) Based upon the information provided by Class Counsel, it appears the time expended and labor required by Class Counsel supports an award equal to the Ninth Circuit benchmark, as requested.

## B.     Results obtained for the class

Courts have recognized consistently that the result achieved is a major factor to be considered in making a fee award.  *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  Here, as noted above, Mr. Pikus reports that the average settlement share for the California

Class Members is $4,178.66 and the average settlement payment for FLSA Class Members is $158.14. (Doc. 82 at 5-6, Pikus Supp. Decl. ¶19)  The highest individual settlement share for the California Class is estimated to be $8,549.93.  (*Id.* at 6, ¶ 19)  Further, the gross settlement fund is equal to 104% of the estimated value of Plaintiffs' claims.  (Doc. 81 at 19)  Given the results achieved by counsel on behalf of Class Members, this factor supports an award of the fees requested.

## C.     Risk undertaken by counsel

The risk of costly litigation and trial is an important factor in determining the fee award. *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

In this action, as discussed above, Plaintiffs "acknowledge that there were substantial risks and uncertainty in proceeding with class certification and trial."  (Doc. 80 at 17)  Further, Class Counsel report:

> Defendants disagreed with Plaintiffs' characterization of the "wellness" bonus, and maintained that it was not required to be included in the regular rate of pay. DE 67-1, at ¶ 25. Additionally, Defendants maintained that they complied with their rest and meal period obligations, had properly trained their managers to authorize rest periods in compliance with California law. *Id.* at ¶ 23. Moreover, Defendants argued that Plaintiffs lacked any common evidence on which to prove class-wide damages for rest period violations, preventing class certification. *Id.*
> With respect to Plaintiffs' claim for meal period violations, Defendants maintained that Plaintiffs faced significant obstacles to certification based on Defendants' automatic deductions, given that whether a meal period was actually taken in instances where the automatic deduction applied would potentially involve individualized inquiries. DE 67-1, at ¶ 24. Additionally, Defendants argued that all meal periods for shifts greater than five hours but less than six hours, and shifts greater than ten hours but less than twelve hours, had been lawfully waived. *Id.* This prevented certification, Defendants asserted, because adjudication of the waiver issue would involve individualized inquiries for each shift worked of these durations. *Id.* Moreover, Defendants contended that waiting time penalties based on the alleged regular rate miscalculation would be confiscatory and therefore potentially unconstitutional, given the great disparity between the amount of unpaid wages and the resultant penalties. DE 67-1, at ¶ 19.

(Doc. 81 at 23)

Although Class Counsel confronted unsettled legal issues, Class Counsel did not face extreme risks in pursuing this litigation.  For example, in *Vizcaino*, the plaintiffs "lost in the district court—once

19

on the merits, once on the class definition" and the class counsel twice "succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1303.  The court found the pursuit of the case was "extremely risky" given the absence of supporting precedents" and the challenges faced in the appeals. *Id.*  As such, the risks supported an award of fees slightly above the benchmark. *Id.* at 1048-49.  In contrast, here, though Defendants denied liability, Class Counsel were not forced to defend a motion attacking the merits of the claims or the propriety of class certification. However, the fact that counsel were able to settle this matter for an amount higher than they believed they could achieve at trial and in a relatively quick and efficient manner, the Court finds this factor favors approval of the benchmark.

### D.    Complexity of issues and skill required

The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award.  *See, e.g., Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *14-15 (E.D. Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund, the Court observed the case involved "complex issues of constitutional law in an area where considerable deference is given to jail officials," and the action "encompassed two categories of class members"); *see also In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *66 (C.D. Cal. June 10, 2005) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award").

Class Counsel contend, "This litigation involved complex and unsettled factual and legal issues pertaining to Defendants' liability for unpaid overtime wages under California law and the FLSA, as well as complex legal issues regarding the imposition of derivative penalties, and proving class-wide liability under *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012), and *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013)."  (Doc. 81 at 23)  In addition, Class Counsel report that "[g]iven the complexity of the issues, Plaintiffs also retained an expert with a Ph.D. to assist in the prosecution of the claims."  (*Id.* at 24)

On the other hand, review of the allegations of the pleading reveals that the claims presented in this litigation were not complex.  Class Counsel report that the expert was hired as a "consultant to assess the merits and certification opposition of plaintiffs' claims."  (*See* Doc. 81-1 at 5, ¶ 7)  The expert also was asked "to review and analyze timekeeping and payroll data for all FLSA Settlement

Class members and approximately 73% of the timekeeping data and 85% of the payroll data for the California Settlement Class members." (Doc. 81 at 21) Such tasks are not out of the ordinary in wage and hour litigation. Nevertheless, because Class Counsel seeks a fee award equal to the benchmark, this factor does not weigh against the request.

### E.    Length of professional relationship

Class Counsel initiated this action on behalf of Plaintiff Stephanie Vega and others similarly situated in August 2014. (Doc. 1) This is a relatively short relationship but still existed over the course of years. *See Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years"). However, this does not weigh against the request for the benchmark figure.

### F.    Awards in similar cases

Class Counsel report that the fees requested are comparable to those awarded previously by this Court. (Doc. 81 at 26, citing, *e.g, Morgret v. Applus Technologies, Inc.*, 2015 WL 3466389, at *17 (E.D. Cal. June 1, 2015) (awarding class counsel 25% of the gross settlement fund); *Torchia v. W.W. Graniger, Inc.,* 304 F.R.D. 256, 277 (E.D. Cal. Dec. 29, 2014) (awarding class counsel 20% of the gross settlement fund)). Notably, as discussed above, 25% of a common fund is "benchmark award for attorney fees" in the Ninth Circuit. *Hanlon*, 150 F.3d at 1029; *see also Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013) ("[t]he typical range of acceptable attorneys' fees in the Ninth Circuit is 20 percent to 33.3 percent of the total settlement value"). Given that the fees requested are equal to the benchmark, the awards in similar cases support the requested fee award.

### G.    Lodestar Crosscheck and Market Rate

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable. *Fischer*, 214 F.3d at 1119. However, when the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours." *See Schiller*, 2012 WL 2117001 at *20 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D.Cal. 2007)).

With the hours reported, the Class Counsel reports the resulting lodestar totals $351,425, which Class Counsel asserts is the total after they "reduced their customary hourly rates to conform to what

21

they understand to be acceptable rates within the Eastern District of California." (Doc. 81 at 26) Thus,

the fees requested are 4.27 times the lodestar calculated by Class Counsel. (*Id.*) To calculate the

lodestar, Class Counsel used the following hourly rates:

> $400 for 14-year attorney Hernaldo J. Baltodano (Class of 2002, admitted December 2002), $400 for 10-year attorney Paul K. Haines (Class of 2006, admitted January 2007), $225 for 7-year attorney Tuvia Korobkin (Class of 2009, admitted December 2009), $225 for 4-year attorney Fletcher W. Schmidt (Class of 2012, admitted December 2012), $300 for [10]-year attorney Roxana E. Khan (Class of 2006, admitted December 2006), and $175 for first-year attorney Matthew K. Moen (Class of 2015, admitted December 2015). Counsel also request hourly rates of $125 for litigation assistant Adam Redding-Kaufman and paralegals Eric B. Wooten, Alice W. Mitchell, and Aaron Clark, and $75 for administrative assistant Iriden Lopez.

(*Id.* at 30)  According to Class Counsel,

> Courts in the Eastern District have approved hourly rates similar to those that Class Counsel now respectfully request. *See, e.g., Estrada v. iYogi, Inc.*, CIV No. 2:13-01989 WBS CKD, 2016 WL 310279 at *6 (E.D. Cal. Jan. 26, 2016) ("Courts in the Eastern District of California have regularly approved hourly rates of $400 or more for partners or experienced attorneys"); *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 460-61 (E.D. Cal. 2013) (applying the "prevailing hourly rates in the Eastern District of California" of $400 for partners); *Ontiveros v. Zamora*, 303 F.R.D. 356, 374 (E.D. Cal. 2014) (finding that the reasonable hourly rate in the Eastern District is $400 for experienced attorneys in a wage and hour class action); *Trulsson v. Cnty. Of San Joaquin Dist. Att'y's Office*, Civ. No. 2:11-02986 KJM DAD, 2014 WL 5472787, at *6 (E.D. Cal. Oct. 28, 2014) (approving an hourly rate of $450 for an experienced attorney in a civil rights case); *Silvester v. Harris*, 2014 WL 7239371, at *4, fn. 2 (E.D. Cal. Dec. 2014) (concluding that hourly rates between $250 and $380 are generally accepted); *Gordillo v. Ford Motor Co.*, 2014 U.S. Dist. LEXIS 84359, 2014 WL 2801243 at *14-17 (E.D. Cal. June 19, 2014) (finding $375 per hour was appropriate for competent and highly experienced attorneys, $200 to $300 was the accepted hourly rate for attorneys with less than ten years of experience, and $125 was reasonable for paralegals); *Willis v. City of Fresno*, Case No. 1:09-CV-01766-BAM, 2014 WL 3563310 (E.D. Cal. July 17, 2014) (finding that, for competent practitioners with less than ten years of experience, the accepted range is between $175 and $300 per hour, with the accepted range for paralegals between $75 and $150 per hour); *Estate of Crawley v. Kings Cnty.*, No. 1:13-CV-02042-LJO, 2015 WL 4508642, at *7 (E.D. Cal. July 24, 2015) (finding a $330 hourly rate appropriate for attorney with approximately 15 years of experience); *Archer v. Gipson*, Case No. 1:12-CV-00261-LJO-JLT, 2015 WL 9473409 (E.D. Cal. Dec. 28, 2015) (approving $325 per hour for 25-year attorney, and $295 for 10-year attorney).

(Doc. 81 at 31)

However, Class Counsel did not distinguish between the Sacramento Division and the Fresno

Division of the Eastern District. The Supreme Court explained that attorney fees are to be calculated

with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895-96

and n.11 (1984).  In general, the "relevant community" for purposes of determining the prevailing

market rate is the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Thus, when a case is filed in the Fresno Division of the Eastern District of California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate …" *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011). Significantly, the cases cited by Class Counsel indicate the Sacramento Division tends to award slightly greater fees than the Fresno Division, and Class Counsel have not identified any cases in which the Fresno Division authorized an hourly wage exceeding $380. This Court determined "the hourly rate[] generally accepted in the Fresno Division for competent experienced attorneys is between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience." *Silvester v. Harris*, 2014 U.S. Dist. LEXIS 174366, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 17, 2014) (citing *Willis v. City of Fresno*, 2014 U.S. Dist. LEXIS 97564 (E.D. Cal. July 17, 2014); *Gordillo v. Ford Motor Co*., 2014 U.S. Dist. LEXIS 84359 (E.D. Cal. June 19, 2014). Further, the Court found acceptable rates "for an attorney with less than ten years of experience" ranged "between $175 to $300," noting that attorneys with four and five years of experience were recently awarded $200 per hour. *Silvester*, 2014 WL 7239371 at *4, n.2. Finally, "the current reasonable hourly rate for paralegal work in the Fresno Division ranges from $75 to $150, depending on experience." *Id.* at *13.

On the other hand, this action was initiated in the Northern District of California where fees are generally higher and was removed to this Court over the preference of the plaintiffs. Thus, this factor weighs toward considering higher per hour rates than usual. Considering these factors, the Court finds a reasonable rate for Mr. Baltodano and Mr. Haines to be $400 per hour. *See e.g., Silvester*, 2014 WL 7239371 (awarding $380 per hour to an attorney with "about 20 years of experience"); *Miller v. Schmitz*, 2014 WL 642729 at *3 (E.D. Cal. Feb. 18, 2014) (awarding $350 per hour for an attorney with 20 years of experience). However, the rate for Mr. Schmdt, who has four years of experience, is reduced to $200 per hour. *Id.* at *4, n.2. With this rate correction, the lodestar amount is reduced by $4,155 to a total of $347,270..

**III.     Amount of Fees to be Awarded**

Significantly, there is a strong presumption that the lodestar is a reasonable fee. *Gonzalez*, 729

1    F.3d at 1202; *Camacho*, 523 F.3d at 978.  As a result, "a multiplier may be used to adjust the lodestar

2    amount upward or downward only in rare and exceptional cases, supported by both specific evidence

3    on the record and detailed findings . . . that the lodestar amount is unreasonably low or unreasonably

4    high." *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000 (internal

5    punctuation and citations omitted).  Nevertheless, the Ninth Circuit observed that the lodestar is

6    "routinely enhanced . . . to reflect the risk of non-payment in common fund cases."  *In re Washington*

7    *Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1300.

8         Here, the requested fees of $1,500,000.00 would result in a multiplier of approximately 4.31,

9    which exceeds the range typically awarded in the Ninth Circuit.  *See Vizcaino*, 290 F.3d at 1051

10   ("multiples ranging from one to four are frequently awarded in common fund cases when the lodestar

11   method is applied").  Class Counsel faced only moderate risks, did not face complicated factual issues,

12   and were not precluded from other work while prosecuting this action on Plaintiffs' behalf. In light of

13   these facts, the benchmark of 25% is appropriate.  *See Barbosa v. Cargill Meat Solutions Corp.*, 297

14   F.R.D. 431, 448 (E.D. Cal. 2013) ("[t]he typical range of acceptable attorneys' fees in the Ninth Circuit

15   is 20 percent to 33.3 percent of the total settlement value"); *see also Six Mexican Workers*, 904 F.2d at

16   1311 (awarding "the 25 percent standard award" where "the litigation lasted more than 13 years,

17   obtained substantial success, and involved complicated legal and factual issues").  Accordingly Class

18   Counsel's request for attorney fees is **GRANTED** in the modified amount of 25% of the Settlement

19   fund, or $1,500,000.00.

20                          <u>**REQUESTS FOR COSTS**</u>

21   **I.    Litigation Expenses**

22        Reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil

23   Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying

24   clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Here,

25   Plaintiff's counsel seeks a total reimbursement of $45,011.88 for costs incurred in the course of this

26   action.  (Doc. 81 at 33)  The "collective out-of-pocket costs includes filing fees, messenger fees, legal

27   research expenses, copying costs, mediation fees, postage, federal express charges, expert fees,

28   mileage, and travel expenses for court hearings and mediation."  (*Id.*, citing Doc. 81-1, Baltodando

1   Decl. Exh. B; Doc. 81-2, Haines Decl. Exh. B)

2         Previously, this Court noted that costs "including filing fees, mediator fees . . . , ground

3   transportation, copy charges, computer research, and database expert fees . . . are routinely reimbursed in

4   these types of cases." *Alvarado v. Nederend*, 2011 WL 1883188 at \*10 (E.D. Cal. Jan. May 17, 2011).

5   Review of the expenses itemized by Class Counsel indicates the expenses fall within categories

6   "routinely reimbursed."  Accordingly, the request for litigation costs in the amount of $45,011.88 is

7   **GRANTED**.

8   **II.      Costs of Settlement Administration**

9         Under the terms of Settlement, the Claims Administrator was "responsible for sending notices

10   required under the Class Action Fairness Act ("CAFA") and for calculating claims and preparing all

11   checks and mailings."  (Doc. 67-1 at 21, Settlement § 7)  The Claims Administrator was also

12   responsible for receiving any exclusions forms from individuals who wish to opt out of the action.  (*Id.*)

13   For the actions taken, the Settlement provides the Claims Administrator may receive up to $35,000 for

14   its tasks.  (*Id.* at 18)  Here, Mr. Pikus indicated, "The total cost or the administration of this Settlement,

15   including fees incurred and future costs for completion of the administration is estimated to be

16   $35,000."  (Doc. 82 at 6, Pikus Decl. ¶ 20)

17         The administrative expenses requested are within the range of previous costs for claims

18   administration awarded in this District.  *See, e.g, Bond v. Ferguson Enterprises, Inc.*, 2011 WL

19   2648879, at \*8 ($18,000 settlement administration fee awarded in wage an hour case involving

20   approximately 550 class members); *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 483-84 (E.D.

21   Cal. 2010) ($25,000 settlement administration fee awarded in wage and hour case involving

22   approximately 170 potential class members).  Accordingly, the request for $35,000 in administration

23   expenses for the settlement administration by Rust Consulting, Inc. is **GRANTED**.

24         **PLAINTIFF'S REQUEST FOR AN INCENTIVE AWARD**

25         The Settlement provides that Plaintiffs may seek enhancement payments "up to" $10,000 each.

26   (Doc. 67-1 at 27, Settlement § 3.B(4))  Plaintiffs now seek awards of $10,000.00 each.  (Doc. 81 at

27   24)  In the Ninth Circuit, a court has discretion to award a class representative a reasonable incentive

28   payment.  *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463.  Incentive

payments for class representatives are not to be given routinely.  In *Staton*, the Ninth Circuit observed,

> Indeed, '[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

*Id.* at 975.  In evaluating a request for an enhanced award to a class representative, the Court should consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation."  *Id.* at 977.  Further, incentive awards may recognize a plaintiff's "willingness to act as a private attorney general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

## A.    Actions taken to benefit the class

The Settlement explains the enhancement is to be given to Plaintiffs "in recognition of their contributions to the Lawsuit and their service to the Settlement Classes."  (Doc. 67-1 at 18, Settlement § 3.B(4))  Ms. Vega estimates she "spent approximately 20 to 25 hours" on activities related to this action, and reports:

> In order to assist in the litigation, I performed the following tasks: I gathered and reviewed various documents for use in the lawsuit, including my wage statements, employee file, and employee handbook; I reviewed and analyzed documents related to the claims at issue, such as Defendants' relevant wage and hour policies, and met with my attorneys on multiple occasions to discuss and explain both these policies, and Defendants' usual wage and hour practices during the time frame that I worked for them; I frequently discussed the case with my attorneys, both telephonically and in-person; I reviewed pleadings filed with the Court; I responded to multiple sets of written discovery and prepared for my deposition; and I attended several meetings with my attorneys to discuss case strategy and to better understand my duties as the Class Representative.

(Doc. 81-6, Vega Decl. ¶ 4)  Similarly, Mr. McNatt estimates that he "spent approximately 30 hours" on tasks related to the litigation, stating:

> Among other things, I gathered various documents for use in the lawsuit, and reviewed and analyzed documents related to the claims for unpaid overtime wages, such as my wage statements, employee handbook, and Defendants' relevant wage policies. I have also discussed the case with Mr. Baltodano on numerous occasions via telephone and in-person, reviewed pleadings filed with the Court, prepared for deposition, and attended several meetings with Mr. Baltodano to discuss case strategy and explain Defendants' wage and hour practices and policies that I was subjected to while employed by Defendants. I also met with Mr. Baltodano to better understand my duties

as the Class Representative. I would estimate that I have spent between approximately
30 hours [] on these activities.

(Doc. 81-5 at 3, McNatt Decl. ¶ 4)

Notably, Plaintiffs would have undertaken much of these same actions whether or not the action
was brought on behalf others similarly situated.  Nevertheless, undoubtedly, their actions benefitted the
class such that they weigh in favor of an incentive payment.

**B.     Time expended by Plaintiffs**

Although Plaintiffs report the tasks undertaken in this action, neither provide any estimate of the
number of hours or the time expended on the individual tasks.  In addition, while Plaintiffs prepared to
be deposed, it does not appear they were required to submit to the depositions. Further, there is no
indication the plaintiffs attended the mediation with Class Counsel.  Therefore, this factor weighs only
slightly in favor of an incentive payment to Plaintiffs.

**C.     Fears of workplace retaliation**

Both Plaintiffs are *former* employees of Defendants, and their positions were terminated prior to
the initiation of this action.  (Doc. 81-6 at 4, Vega Decl. ¶ 2; Doc. 81-5 at 2, McNatt Decl. ¶ 2) Because
Plaintiffs are former employees, retaliation by Defendants in their workplace was not possible.  Further,
there is no support for Mr. McNatt's implication that his difficulty finding new work—or "fac[ing]
homelessness during the last year because of the difficulty" (Doc. 81-5 at 3)—is directly related to his
being identified as a named plaintiff in September 2015.[2]  Thus, this factor does not support incentive
payments to Plaintiff.

**D.     Reasonableness of Plaintiffs' request**

Considering the actions taken by Plaintiffs and the time expended, an incentive award is
appropriate.  In determining the amount to be awarded, the Court may consider the time taken by the
class representatives, the fairness of the hourly rate, and how large the incentive award is compared to
the average award class members expect to receive.  *See, e.g., Ontiveros v. Zamora*, 2014 WL 5035935

---

[2] Indeed, in light of the significant downsizing of oil-related companies in the last 18 months due to the depressed prices of
the type of crude taken from this area, hundreds of former oilfield workers faced the same difficulty Mr. McNatt faced in
attempting to find fulltime work within the oil industry. There is no evidence that it was the filing of this lawsuit, rather than
the downturn in this economic sector that caused Mr. McNatt's financial woes.

(E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine

whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 U.S. Dist. LEXIS

72250, at *5 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to

the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11

(considering the time and financial risk undertaken by the plaintiff).  Here, considering these factors,

the $10,000 award that Plaintiffs request is out of proportion to the efforts made and time expended.

     1.    Time expended

     In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to

Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims

alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced

evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL

1883188 at *11.  Further, the Court noted the plaintiffs "undertook the financial risk that, in the event

of a judgment in favor of Defendant in this action, they could have been personally responsible for the

costs awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of

$7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.

     Likewise, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two

named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy

interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and

prepared and evaluated the case for mediation, which was a full day session requiring very careful

consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class."

*Bond*, 2011 WL 2648879, at *15.  Similarly, the Northern District determined class representatives

failed to justify incentive awards of $10,000 although the plaintiffs reported "they were involved with

the case by interacting with counsel, participating in conferences, reviewing documents, and attending

the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*, 2012 U.S. Dist.

LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).

     In this case, Plaintiffs seek awards that greater than the amount of the incentive awards

approved in *Alvarado* and *Bond*.  However, Plaintiff did not suffer the inconvenience of traveling for

mediation.  Further, although Plaintiff assisted with the production of documents and reviewing

1    evidence produced by Defendants, it does not appear that Plaintiffs were involved in any investigations

2    related to their claims, and were neither interviewed nor deposed.  Consequently, the requested award

3    of $10,000 is excessive.

4                    2.    Fairness of the hourly rate

5          This Court criticized a requested award of $20,000 where the plaintiff estimated "he spent 271

6    hours on his duties as class representative over a period of six years," because the award would have

7    compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 2014 WL 5035935 at *5-

8    6. The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives

9    to make up for financial risk . . . for example, for time they could have spent at their jobs." *Id.* at *6

10   (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  The Court found an

11   award of "$50 per hour fairly compensate[] the named plaintiff for his time and incorporates an extra

12   incentive to participate in litigation," considering that the plaintiff's hourly flat rate while employed by

13   the defendant was $15 per hour. *Id.* at *6; n.3.  Nevertheless, the Court increased the award from

14   $13,550 (calculated with $50 per hour for the 271 hours) to $15,000 because "Mr. Ontiveros

15   relinquished the opportunity to bring several of his own claims." *Id.* at *6.

16         Here, with the estimated time of up to 25 hours spent on the action, Ms. Vega seeks an award

17   that would compensate her at a rate of $400 per hour.  Likewise, with the estimated 30 hours taken by

18   Mr. McNatt, he would be compensated at a rate of nearly $335 per hour.  If the Court were to adopt the

19   $50 per hour rate approved in *Ontiveros*, the award for Ms. Vega would be reduced to $1,250 and the

20   award for Mr. McNatt would be $1,500.

21                   3.    Comparison of the award to those of the Class Members

22         *In Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained

23   counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011

24   U.S. Dist. LEXIS 72250, at *5.  The Court found the amount reasonable, in part because "the sum is

25   reasonably close to the average per class member amount to be received." *Id.*  Here, "the requested

26   $10,000 payments are only 1.42 times the average settlement shares for the top 33% of California Class

27   members, and only $1,453.73 higher than the largest payment of $8,546.27." (Doc. 81 at 35) Thus, this

28   factor favors the requested incentive award.

**E.      Amount to be awarded**

In light of the efforts expended by Plaintiffs, and the average awards expected to be received by the Class Members, the Court finds $5,000 is an appropriate incentive award.  With an hourly rate of $50 per hour, Plaintiffs would be entitled to awards of $1,250 to $1,500.  However, an increase of the award is appropriate to reflect the fact that Plaintiffs released more claims as part of the settlement than the Class Members.  *See Ontiveros*, 2014 WL 5035935 at *5-6.  Thus, Plaintiffs' request for class representative incentive payments is **GRANTED** in the modified amount of $5,000 for each.

<u>**CONCLUSION AND ORDER**</u>

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.      Plaintiff's motion for final approval of the Settlement Agreement is **GRANTED**;

2.      Plaintiffs' request for certification of the Settlement Classes is **GRANTED**, and the classes are defined as follows:

> A.      **California Settlement Class**: all non-exempt employees who worked for Weatherford in California between August 28, 2010 through July 4, 2016.

> B.      **FLSA Settlement Class**:  all individuals who opted into the lawsuit during the notice period.

3.      Plaintiffs' request for a class representative incentive payment is **GRANTED** in the modified amount of $**5,000** each;

4.      Class Counsel's motion for attorneys' fees is **GRANTED** in the amount of $**1,500,000**, which is 25% of the gross settlement amount;

5.      Class Counsel's request for costs in the amount of $**45,011.88** is **GRANTED**;

6.      The request for fees for the Claims Administrator Rust Consulting, Inc. in the amount of $**35,000.00** is **GRANTED**; and

7.      The California Labor Code Private Attorney General Act payment to the State of California in the amount of $**50,000** is **APPROVED**;

8.      The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court; and

1     9.    The Court hereby retains jurisdiction to consider any further applications arising out of

2    or in connection with the Settlement.

3

4  IT IS SO ORDERED.

5  Dated:   **December 7, 2016**       **/s/ Jennifer L. Thurston**

6                   UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28